UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|   |   |   |
|---|---|---|
| Whoop, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 19-10210-LTS |
| | ) | |
| Ascent International Holdings, Ltd., | ) | |
| International Group Co., Ltd; Ascent | ) | |
| International Corporation; Ascent Batteries | ) | |
| International. Inc. and Alium Batteries, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

ORDER ON MOTION TO COMPEL ARBITRATION (DOC. NO. 11)

May 10, 2019

SOROKIN, J.

Plaintiff Whoop, Inc. ("Whoop") contracted with Defendants Ascent International Group Co., Ltd. ("AI") and Ascent Batteries International, Inc. ("AB"), collectively "Ascent," to manufacture batteries for Whoop's fitness tracking devices. Whoop alleges that some of the batteries overheated, thereby harming its customers and their property. Whoop sued Ascent for breach of contract, products liability, violation of chapter 93A, and indemnification. Doc. No. 1-1 at 12-19. Ascent moved to compel arbitration, asserting that the claims against it fall within the scope of an arbitration provision contained in the parties' contract. Doc. No. 12 at 1-2. Whoop opposed. Doc. No. 15. For the reasons discussed below, Ascent's motion to compel arbitration is DENIED.

I.   FACTS[1]

Plaintiff Whoop offers fitness tracking products that help "individuals and teams perform at a higher level." Doc. No. 1-1 ¶ 2. Whoop has sued four related manufacturers and sellers of the batteries installed in these products,[2] claiming certain batteries it purchased from the defendants were defective in various ways. Id. at ¶¶ 2-10. Two defendants, AI and AB, move to compel arbitration of the claims relating to batteries described in a January 12, 2017, purchase order (PAR-70018). Doc. No. 11. They say claims arising from those batteries are subject to mandatory arbitration. Id.

The parties dispute whether the allegedly defective batteries also came from other purchase orders. However, this dispute is not presently before the Court since Ascent has only moved to compel arbitration of the claims arising from batteries produced under the January 12, 2017, purchase order. The following facts bear mention with respect to that purchase order.

In or around February 2015, Whoop engaged Ascent to design battery specifications and manufacture two different batteries for its fitness bands—the "Kenmore" and "Ortiz" batteries. Id. ¶ 25. The specifications describe the batteries' technical details, such as performance, safety testing, operating instructions, and warranty period. Doc. No. 17-2 at 11-22. Based on these specifications, Whoop placed various purchase orders for Kenmore and Ortiz batteries between 2015 and 2017. Each of these orders sought small numbers of batteries.

---

[1] The facts are drawn from the allegations in the Complaint and the additional documents submitted by the parties bearing on the issues before the Court. Neither party has objected to the Court's consideration of these documents.
[2] The four defendants are Ascent International Group Co. Ltd ("AI"), Ascent Batteries International, Inc. ("AB"), Ascent International Holdings, Ltd. ("AH"), and Ascent International Corporation ("AC"). Doc. No. 1-1 ¶¶ 2-10. The parties agree that the fifth named defendant, Alium Batteries, is not a separate entity, but a trade name used by AI. Doc. No. 12 at 7; Doc. No. 15 at 9.

2

On January 12, 2017, Whoop emailed purchase order PAR-70018 to Ascent, requesting 7,300 Kenmore batteries and 5,200 Ortiz batteries, both at a price of $3.38/unit with net 30[3] payment terms. Doc. No. 13-4 at 2-3. The purchase order ("PO") is addressed to AB and provides Whoop's shipping address and requested delivery date. Id. at 3. In the description column, the purchase order specifies the type of battery ordered and includes the following instructions:

> PO to provide coverage for Ascent to begin work on order immediately
> Volume pricing should be consistent with quote of 5/19 from Brett Kacura[4]: 5k @ 3.375 USD, 10k @ 3.30 USD
> Awaiting formal quote per Chas Esposito[5]

Id. In its email accompanying the purchase order, Whoop also instructs Ascent to "use this PO to begin preparation of this material immediately." Id. at 2. Under "quote number," the purchase order references Ascent's "[e]mail of 5/19," which discusses volume pricing for large battery orders. See Doc. No. 17-3 at 9. Neither the January 12, 2017, purchase order, Doc. No. 13-4 at 3, nor the May 19 Brett Kacura email quote, id. at 2, discuss any terms or conditions involving arbitration.

On January 14, 2017, Ascent emailed quote #100183 to Whoop. Doc. No. 26-1 at 2, 4. The email was sent from an AB email address and the quote is on AI's letterhead. The quote states that Ascent would sell 10,000 Kenmore batteries for $3.38/unit and 10,000 Ortiz batteries for $3.51/unit with net 10 payment terms. Id. at 4. The quote further recites that "all quotes are subject to Ascent International Group Co., Ltd. standard terms and conditions of sale . . . Please go to the following link for complete list of terms and conditions of sale

---

[3] The Court understands "net 30" to mean that the buyer must pay the seller within 30 days of the shipment of the goods.
[4] Brett Kacura is a principal of AB. Doc. No. 13 at 1.
[5] Chas Esposito was an employee of AB in January 2017. Doc. No. 26 at 1.

3

http://ascentbatteries.com/?page_id=630."[6] Id. The terms and conditions linked in quote #100183 include the following relevant provisions:

> **3. ACCEPTANCE OF BUYER'S ORDER.** Seller's terms and conditions herein apply to all Offers made, and all Orders accepted, by Selle [sic] Seller's acceptance of Buyer's Order, and any changes or amendments thereto is strictly limited to and conditioned up on Seller's terms and conditions. Unless otherwise agreed in writing by a duly authorized representative of Seller, Seller objects to and is not bound by terms or conditions that differ from, add to, or modify Seller's terms and conditions. . . . Unless Seller agrees otherwise, Buyer's issuance of an Order in response to Seller's Offer shall conclusively evidence Buyers unconditional acceptance of Seller's terms and conditions irrespective of any different terms and conditions Buyer may offer or include in its Order. . . .
>
> **28. DISPUTES AND ARBITRATION.** The Parties shall attempt to resolve any dispute, controversy, or claim arising under or relating to Seller's Offer or buyer's Order, or to a material breach, including its interpretation, performance, or termination. If the parties are unable to resolve such dispute, either Party may refer the dispute to arbitration. The arbitration shall be conducted in English and in accordance with the Commercial Rules of the American Arbitration Association, which shall administer the arbitration and act as appointing authority. The arbitration, including the rendering of the decision and/or award, shall take place in Philadelphia, Pennsylvania United States of America, and shall be the exclusive forum for resolving the dispute, controversy, or c[7]

Doc. No. 17-3 at 20, 27.

On January 18, 2017, Whoop emailed Ascent to inquire whether the prices listed in quote #100183 applied to smaller orders and attached a revised purchase order. Doc. No. 13-5 at 2.

---

[6] Due to an error in Ascent's records software, Ascent inadvertently submitted a version of quote #100183 containing an incorrect link (http://aliumbatteries.com/terms-and-conditions-of-sale/) to the additional terms and conditions. Doc. No. 24 at 2. This incorrect link was not active in January 2017, and the terms it linked to recite a Hong Kong arbitration provision. Id. After realizing its error, Ascent submitted a corrected version of quote #100183 containing a link (http://ascentbatteries.com/?page_id=630) to a set of terms and conditions which included a Philadelphia arbitration provision. Id. at 2-3.

[7] In the Terms and Conditions Ascent provided to the Court, there appears to be a typographical error in paragraph 28, as quoted above. The sentence in which Ascent names Philadelphia, Pennsylvania as the exclusive forum ends with an incomplete word, and the following sentence begins thereafter. Neither party has argued that the "missing" word (which appears to begin with the letter "c") is material to the resolution of this case.

The revised purchase order references Ascent's quote #100183 and requests 7,300 Kenmore for $3.38/unit and 5,200 Ortiz batteries for $3.51/unit with net 30 payment terms. Id. at 4.

On February 8, 2017, Whoop emailed to inform Ascent that it had inadvertently switched the requested quantities of the two batteries in its January 18, 2017 revised purchase order. Doc. No. 13-6 at 2. Whoop attached a second revised purchase order requesting 5,200 Kenmore batteries for $3.38/unit and 7,300 Ortiz for $3.51/unit with net 30 payment terms. Id. at 9. The February 8, 2017 purchase order is otherwise substantively identical to the January 18, 2017 purchase order.

Sometime after February 8, 2017 (the record does not reflect the specific date), Ascent sent Whoop sales order #300465 to confirm Whoop's order for 7,300 Ortiz batteries at a price of $3.51/unit and 5,200 Kenmore batteries at a price of $3.38/unit, with net 30 payment terms. Doc. No. 14-4 at 2. The price, quantity, and payment terms exactly matched the February 8 purchase order sent by Whoop. As with quote #100183, the order confirmation is on AI's letterhead and includes a link to terms and conditions of sale involving a Philadelphia arbitration clause. Id. Based on the record before the Court, neither party sent any other forms regarding this order of batteries after Ascent's sales order #300465.

Ascent fulfilled Whoop's order in two shipments on March 25, 2017, and April 8, 2017. Doc. No. 12 at 5. Both shipments were accompanied by invoices (#500614 and #500637) that contain links to terms and conditions involving a Philadelphia arbitration clause. Doc. No. 17-3 at 17 and Doc. No. 14-3 at 2.[8] Whoop accepted the batteries shipped by Ascent.

---

[8] Page 2 of Document Number 14-3 contains the incorrect link to terms and conditions. To date, neither Ascent nor Whoop has submitted a corrected copy.

Nearly one year later, on February 10, 2018, Whoop notified Ascent of an issue with batteries overheating in Whoop's fitness bands. Doc. No. 1-1 ¶ 32. After additional testing, Whoop began recalling and replacing products with the allegedly defective batteries. Doc. No. 17-1 ¶ 36.

On January 31, 2019, Whoop filed an eight-count complaint in the Massachusetts Superior Court alleging: breach of contract (Count I), negligence (Count II), strict products liability for defective design and failure to warn (Count III), breach of implied warranties of merchantability and fitness for a particular purpose (Count IV), breach of express warranty (Count V), negligent interference with prospective economic relations (Count VI), unfair and deceptive business practices under Mass. Gen. Laws ch. 93A (Count VII), and implied indemnity (Count VIII). Doc. No. 1-1. Ascent timely removed the case to this Court. Doc. No. 1.

On February 15, 2019, Ascent[9] moved to compel arbitration in Hong Kong, asserting that all of Whoop's claims are subject to an arbitration provision contained in the parties' contract. Doc. No. 12 at 1. Whoop opposed and asserted that Ascent submitted an incorrect copy of quote #100183 containing a link that was inoperative in January 2017. Doc. No. 15 at 22-23. Ascent conceded this point and submitted a corrected exhibit (discussed above). The correct link, which Ascent confirmed in its reply brief, leads to terms and conditions requiring arbitration in Philadelphia, not Hong Kong. Doc. No. 24 at 1. The Court heard oral argument from the parties on April 12, 2019.

---

[9] AI and AB are the moving parties. Doc. No. 11 at 1. Neither AC nor AH moved to compel arbitration.

II.      LEGAL STANDARD

When ruling on a motion to compel arbitration, courts should "draw [upon] the relevant facts from the operative complaint and the documents submitted . . . in support of the motion to compel arbitration." Cullinane v. Uber Techs., Inc., 893 F.3d 53, 55 (1st Cir. 2018). Motions to compel arbitration are subject to the same standard of review as motions for summary judgement, requiring courts to "consider facts in the light most favorable to the non-movant . . . and exercise [their] wide discretion to look beyond the complaint at pleadings and documents submitted by either party." Perez-Tejada v. Mattress Firm, Inc., Civ. No. 17-12448, 2019 WL 830450, at *1 (D. Mass. Feb. 21, 2019) (quoting Boulet v. Bangor Sec. Inc., 324 F.Supp.2d 120, 123 (D. Me. 2004)) (internal quotation marks omitted).

Section 4 of the Federal Arbitration Act permits parties "aggrieved by another party's refusal to arbitrate to petition a district court to compel arbitration in accordance with the parties' preexisting agreement." Campbell v. General Dynamics Gov't Sys. Corp., 407 F.3d 546, 552 (1st Cir. 2005); see also 9 U.S.C. § 4. However, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." AT&T Techs., Inc. v. Commc'ns Workers, 475 U.S. 643, 648 (1986) (quotation marks omitted).

Ascent, as the party moving to compel arbitration, bears the burden to show "that a valid agreement to arbitrate exists, that the movant is entitled to invoke the arbitration clause, that the other party is bound by that clause, and that the claim asserted comes within the clause's scope." Campbell, 407 F.3d at 552 (quoting InterGen N.V. v. Grina, 344 F.3d 134, 142 (1st Cir. 2003)). To create an enforceable contract, "there must be agreement between the parties on the material

terms of that contract, and the parties must have a present intention to be bound by that agreement." Situation Mgmt. Sys., Inc. v. Malouf, Inc., 430 Mass. 875, 878 (2000). [10]

Here, both parties agree that a valid contract exists but dispute whether the terms of that contract include arbitration. Disputes about whether a specific term is included in a contract for the sale of goods after an exchange of forms are resolved by the rules set out in § 2-207 of the Uniform Commercial Code ("UCC"). See JOM, Inc. v. Adell Plastics, Inc., 193 F.3d 47, 52-54 (1st Cir. 1999). Section 2-207 states:

> (1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.
> (2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:
>     (a) the offer expressly limits acceptance to the terms of the offer;
>     (b) they materially alter it; or
>     (c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.
> (3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this Act.

Massachusetts enacted § 2-207 of the UCC under Mass. Gen. Laws ch. 106, § 2-207. This section departs from § 2-207 of the UCC in only one way: whereas subsection (2) of § 2-207 of the UCC applies only to "additional terms," subsection (2) of its Massachusetts counterpart applies to "additional or different terms." Apart from this variation, the sections are identical.

---

[10] During the April 12, 2019, hearing, the parties orally stipulated that Massachusetts law should apply to issues of contract formation. Accordingly, the Court applies Massachusetts law.

To determine whether the terms of the parties' contract include the arbitration clause, the Court looks first to which documents constitute the offer and acceptance and what terms are recited or incorporated by reference in each document.

III. DISCUSSION

　　A. The First Offer

Ascent asserts that its January 14, 2017, quote #100183 constitutes the offer, and Whoop's January 12, 2017, purchase order is merely an invitation for offers because it says "[a]waiting formal quote per Chas Esposito." Doc. No. 12 at 3. Taking quote #100183 as the offer, Ascent argues that the parties formed a contract under § 2-207(1) because Whoop's revised purchase orders (dated January 18, 2017, and February 8, 2017) constitute a counteroffer which Ascent accepted by sending its order confirmation #300465 and shipping the requested batteries. Ascent further argues that this contract validly incorporates a Philadelphia arbitration provision because quote #100183 includes a "conspicuous blue html link" to additional terms and conditions containing such a provision. Id. at 8. Since Whoop's subsequent forms are silent with respect to Ascent's additional terms and conditions, Ascent asserts that these terms—including the arbitration provision—were accepted as part of the parties' contract. Id. at 9.

The Court takes a different view. The January 12, 2017, purchase order constitutes an offer and not a mere invitation for offers. In addition to preceding Ascent's quote by two days, the purchase order recites the price, quantity, types of batteries requested, payment terms, delivery address, and requested delivery date, and states its purpose is to "provide coverage for Ascent to begin work on [the] order immediately." Doc. No. 13-4 at 3. This document is plainly an offer to purchase goods under Massachusetts law, which describes an "offer" as "inviting acceptance in any manner and by any medium reasonable in the circumstances." Mass. Gen.

9

Laws ch. 106, § 2-206. See also I & R Mech., Inc. v. Hazelton Mfg. Co., 62 Mass. App. Ct. 452, 455 (2004) ("An offer is the manifestation of willingness to enter into a bargain made in such a way as to justify the other person in understanding that his assent will conclude the agreement."). Further, under Massachusetts law, "an order or other offer to buy goods for *prompt or current shipment* shall be construed as inviting acceptance either by a prompt promise to ship or by the prompt or current shipment of . . . goods." Mass. Gen. Laws ch. 106, § 2-206 (emphasis added).

Here, Whoop's purchase order not only instructs Ascent to begin work "immediately," but it is also sufficiently detailed to empower Ascent to accept the order by shipping the requested batteries or by simply responding "yes." Although the purchase order recites "[a]waiting formal quote," this language alone cannot transform an offer complete with price, quantity, item description, payment terms, delivery address, and requested delivery date into a mere invitation for offers. See Gilbert & Bennett Mfg. Co. v. Westinghouse Elec. Corp., 445 F. Supp. 537, 545 (D. Mass. 1977) (finding that buyer's purchase order constituted an offer because it "state[d] all necessary terms of the sale," including "the subject matter of the proposed sale," "the number of units sold," "the purchase price," and "the place of delivery").

B.  Subsequent Counteroffers and Acceptance

Having established that Whoop's January 12, 2017, purchase order constitutes an offer, the Court next considers whether Ascent's January 14, 2017, quote constitutes a "definite and seasonable expression of acceptance" or a counteroffer. Compared to Whoop's purchase order, Ascent's quote increases the quantities of Kenmore and Ortiz batteries from 7,300 units and 5,200 units, respectively, to 10,000 units of each battery. The quote also raises the price of Ortiz batteries from $3.38/unit to $3.51/unit and specifies net 10 payment terms as opposed to the net 30 payment terms proposed by Whoop. Under Massachusetts law, Ascent's substitution of a

substantially higher quantity and price term amounts to a rejection of Whoop's offer to buy, and a counteroffer to sell a higher quantity of batteries at a higher price. See Lambert v. Kysar, 983 F.2d 1110, 1115 (1st Cir. 1993) (reduction in quantity from 2600 units to 1650 units was a rejection of seller's offer and constituted a counteroffer). Since Ascent's quote modified significant terms such as quantity, price, and payment terms, it is not a "seasonable expression of acceptance" under § 2-207(1), but is rather a counteroffer, rejecting the initial offer. Because there is no acceptance under 2-207(1), there is no application of § 2-207(2). See id. ("Since [buyer's] alternation of the quantity term amounted to a *rejection* of the original offer, rather than a mere *modification* or *supplementation* of the boilerplate language in the original offer form, this is not an appropriate case for the application of UCC § 2-207(2).") (emphasis in original). See also J. Murray, Murray on Contracts, § 51 (5th ed. 2011) ("To understand the operation of counter offers under 2-207, it is important to remember that § 2-207 was not designed to modify the matching acceptance [mirror image] rule with respect to dickered terms such as price, quantity and subject matter to which the parties consciously advert.").

The February 8, 2017, revised purchase order Whoop sent in response constitutes yet another counteroffer because the parties, at that time, still had not agreed upon on the quantity, price, and payment terms. [11] This revised purchase order confirms Ascent's battery prices but requests substantially lower quantities of each battery (5,200 Kenmore units and 7,300 Ortiz units) and net 30, rather than net 10, payment terms. Doc. No. 13-6 at 9.

The parties therefore did not reach a "definite and seasonable expression of acceptance or a written confirmation" until Ascent sent sales order #300465 to confirm Whoop's order for

---

[11] Whoop's January 18, 2017 purchase order, which recited incorrect quantities of each battery, also was not an acceptance for the same reason—the parties had not agreed on the quantity, price, and payment terms.

11

7,300 Ortiz batteries at a price of $3.51/unit and 5,200 Kenmore batteries at a price of $3.38/unit with net 30 payment terms. Doc. No. 14-4 at 2. At this point, the parties formed a contract under § 2-207(1) because they had finally come to an agreement on the material terms, namely the price, quantity, and payment terms.

The Court first considers the application of 2-207(2) to the additional terms contained in Ascent's terms and conditions. The additional terms and conditions of sale linked in Ascent's sales order #300465 constitute proposals for addition under § 2-207(2).[12] Accordingly, these terms and conditions are merely proposals for additional terms and become a part of the parties' contract if none of the three exceptions under § 2-207(2) applies. Neither party has argued that either subsection (a) or (c) of § 2-207(2) applies. Thus, any such argument is waived. In any event, based on the record, the Court finds that there is no evidence that Whoop's "offer expressly limit[ed] acceptance to the terms of the offer," § 2-207(2)(a) or that "notification of objection to [Ascent's terms and conditions] ha[d] already been given or [was] given within a reasonable time after notice of them [was] received," § 2-207(2)(c). Accordingly, the Court considers only whether subsection (b)—whether the additional terms materially alter the contract—applies.

---

[12] The Court assumes, without deciding, that inclusion of a link to terms and conditions located on a website was sufficient in this case to incorporate those terms and conditions by reference into Ascent's sales order. See Infinity Fluids, Corp. v. General Dynamics Land Systems, Inc., Civ. No. 12–40004, 2013 WL 3158094, at *5 (D. Mass. June 19, 2013) ( "what should have been clear to a sophisticated party like [the plaintiff] is the fact that a separate and conspicuous text box contained on every page of the PO clearly and unequivocally states that the Terms and Conditions can be found at [website link]. . . . his explicit and recurring language sufficiently provided [the plaintiff] with notice of where to locate the Terms and Conditions and the arbitration language contained [therein]").

C.  Material Alternation

If the additional terms in Ascent's forms are not material, they will be incorporated into the parties' agreement. i.Lan Sys. v. Netscout Serv. Level Corp., 183 F.Supp.2d 328 (D.Mass.2002) ("Between merchants, if a party never objects to the additional terms, and the additional terms are not 'material,' then the UCC deems the party to have accepted the additional terms implicitly, for lack of a better description.").

In Massachusetts, courts must undertake a "fact specific, case-by-case analysis to determine whether a proposed term should become a part of the parties' contract." Sibcoimtrex, Inc. v. Am. Foods Grp., Inc., 241 F. Supp. 2d 104, 110 (D. Mass. 2003). While surprise and hardship are among the factors to be weighed in considering all the relevant facts and circumstances, these factors are "a consequence of material alternation, not a definition of it." Id. at 108. In Sibcoimtrex, the court concluded that a seller's proposal to modify a commercial agreement to include an arbitration clause was a material alteration that did not become a part of the parties' contract. Id. In reaching this conclusion, the court considered whether the parties ever discussed how disputes would be resolved, the course of dealing between the parties, and the limiting effects of the arbitration clause at issue. Id. at 109-10. Observing that "[a]n agreement to arbitrate is an agreement to forgo other available avenues of seeking relief for breach of contract," the court noted that arbitration clauses operate as "a limitation on remedies," and Comment 4 to § 2-207 implies that additional terms limiting available remedies should be considered "material additions" that only become effective on an express acceptance. Id. at 110.

Here, as in Sibcoimtrex, there is no indication that the parties ever expressly addressed the question of how disputes would be resolved, except by Ascent's unilateral incorporation of the arbitration clause in its forms. Nor does the parties' course of dealing establish assent to the

13

arbitration provision. While Ascent's forms pertaining to the January 12, 2017 purchase order include links to the arbitration clause, Whoop simply received and retained these forms without signing them or otherwise assenting to the arbitration clause. Since neither party has argued that arbitration is a customary method of dispute resolution in the battery industry, this behavior alone falls short of consent to arbitration. See Diskin v, J.P. Stevens & Co., 836 F.2d 47, 51 (1st Cir. 1987) (refusing to "imply appellant's consent to arbitrate based only on appellee's vague assertion of prior dealings" and "unspecific reference" to industry customs) (emphasis in original). While the Federal Arbitration Act favors arbitration of commercial disputes where the parties have agreed to do so, proof of the existence of an agreement to arbitrate must always precede an order enforcing the agreement. Sibcoimtrex, 241 F. Supp. 2d at 110-11. The Court concludes that no such proof exists here.

The arbitration provision constitutes a material alternation to which Whoop never expressly or implicitly agreed. Therefore, the arbitration provision is not part of the parties' contract.

D. Expressly Conditioned

The Court considers one additional point, which was not argued by the parties. For the reasons expressed above, Ascent's sales order #300465 constituted an acceptance of Whoop's counteroffer in the February 8 purchase order. However, even if Ascent's sales order #300465 had expressly conditioned acceptance on Whoop's assent to its terms and conditions, it would have been another counteroffer, rather than an acceptance. Under § 2-207(1), if the seller's response to the offer makes acceptance "expressly conditional" on the buyer's "assent to the additional or different terms," then the seller's response is a counteroffer and not an acceptance. JOM, 193 F.3d at 53. A contract is then formed through the parties' writings only if the buyer

14

expresses its affirmative acceptance of the seller's counteroffer. Id. However, language that expressly conditions acceptance is "not easily invoked." J.J. White & R.S. Summers, UCC § 1-3, at 39 (5th ed. 2000). The seller's form must place the buyer on "unambiguous notice" that it is merely a counteroffer. See JOM, 193 F.3d at 53.

The Court observes that the terms and conditions of sale linked in Ascent's sales confirmation #100183 state that Whoop's order "is strictly limited to and conditioned upon [Ascent's] terms and conditions" and Ascent "objects to any terms and conditions that differ from, add to, or modify" its terms and conditions. Doc. No. 17-3 at 20. Neither party addressed whether this language is sufficient to expressly condition Ascent's acceptance on Whoop's assent to the linked terms and conditions. Indeed, it is unclear whether this language would be sufficient, as courts are less likely to regard language that departs from the specific language of § 2-207(1) as sufficient. See, e.g., Dorton v. Collins & Aikman Corp., 453 F.2d 1161, 1168 (6th Cir. 1972) (stating "it is not enough that an acceptance is *expressly* conditional on additional or different terms; rather, an acceptance must be expressly conditional on the offeror's *assent* to those terms" and must "clearly reveal[] that the offeree is unwilling to proceed with the transaction unless he is assured of offeror's assent to the additional or different terms therein") (emphasis in original).

Even if the language in Ascent's sales confirmation #100183 was sufficient to trigger an "expressly conditional" acceptance and transform it into yet another counteroffer, the Court finds that the arbitration provision still would not have become part of the parties' contract.[13] The parties would not have formed a contract through their writings because Whoop never expressly

---

[13] The Court perceives no view of the facts under which it could conclude that Ascent made an offer which Whoop accepted in writing. Accordingly, any reasonable interpretation of the facts leads to the conclusion that the arbitration provision is not part of the contract.

15

assented to Ascent's additional terms. Instead, the parties would have formed a contract under § 2-207(3) because their subsequent conduct—shipment and acceptance of the goods—demonstrates that the parties believed that a binding agreement had been formed. JOM, 193 F.3d at 54. "Where the writings do not form a contract, subsection (3) states its own criteria—'those terms on which the writings agree' plus any terms that would be provided by other Code sections." Commerce & Indus. Ins. v. Bayer Corp., 433 Mass. 388, 394 (2001). The arbitration provision therefore would not become a term of the parties' contract because it was not common to both parties' forms and none of the gap-filling provisions of Mass. Gen. Laws ch. 106 provide for arbitration. Id. at 394-95.[14]

IV. CONCLUSION

Ascent's motion to compel arbitration, Doc. No. 11, is DENIED. Responses by the defendants to the Complaint are due by May 24, 2019.

SO ORDERED.

/s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge

---

[14] The Court takes no position as to which other provisions in Ascent's terms and conditions may be part of the parties' contract. Certainly, those provisions which are material are not part of the contract, while those provisions which are not material are part of the contract. However, the Court expresses no view at this time as to which specific provisions, other than the arbitration provision, are in fact material.